```
                   UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                                CRIMINAL ACTION NO. 2:13-00151

**KENNETH RUSH**


<u>MEMORANDUM OPINION AND ORDER</u>

Pending is defendant Kenneth Rush's motion to suppress, filed December 24, 2013.

On January 7, 2014, the court held an evidentiary hearing attended by counsel for the parties and Mr. Rush. The matter is now submitted for decision. The court enters its findings of fact and conclusions of law as follows.

I.

On Wednesday, May 23, 2012, Lt. A. C. Napier, who as a member of the Charleston Police Department is commander of the Metropolitan Drug Enforcement Network Team, received a call from Marquita Wills. Ms. Wills advised that Mr. Rush was in her

apartment at Drexel Place, Cross Lanes, West Virginia, where he had spent the preceding night and that he was dealing drugs from her apartment which she believed to be cocaine. She wanted him out. She did not say she had asked him to leave.

Lt. Napier arranged to meet Ms. Wills, who was working that day, quickly at a location away from her apartment at about 9:30 a.m. that morning. She signed a consent to search form at about 9:40 a.m. authorizing Lt. Napier to conduct a search of her apartment at Drexel Place and provided him with the key to the apartment for entry.

Lt. Napier promptly assembled a group of officers consisting of Sgt. William Winkler, Detective Keven Allen, Detective Ryan Higginbotham, Detective Tagayun, and Officer Halstead, who was in uniform, to visit Ms. Will's apartment. Arriving at the apartment about 10:00 a.m., the front door was opened, without knocking, with the key provided by Ms. Wills. They announced, "Police." The apartment is a one-floor plan unit, with the bedrooms in the back. The officers, with weapons drawn, were intent on initially securing the premises and ascertaining whether there were any occupants. They expected to find Mr. Rush there.

Detectives Allen and Higginbotham entered first and went to the master bedroom where they found Mr. Rush asleep in bed.  For officer safety, they had him get out of bed, handcuffed him in front and escorted him to the couch in the living room.  He offered no resistance.  Sgt. Winkler first encountered Mr. Rush in the living room.  Mr. Rush asked, "What's going on.  Why you all here?"  Sgt. Winkler responded, "We have a search warrant."  Other than that exchange, Mr. Rush said and did nothing to challenge the authority of the officers to be in the apartment or conduct the search, nor did he ask the officers to stop searching; but he did not expressly give his consent.  Sgt. Winkler was aware that the officers had no search warrant, though he apparently thought it prudent to state that they had a search warrant in order to protect Ms. Wills, who had expressed some fear of Mr. Rush and his family.

Mr. Rush remained in handcuffs for about five minutes while the officers secured the premises.  Once the officers established that no one else was in the apartment, the handcuffs were removed and he was told he was not under arrest and was free to leave.  At that point the search began.  Sgt. Winkler searched the kitchen area where, in a kitchen wall cabinet, four bags of crack cocaine were found under a Styrofoam cup and

another four bags were found in an adjacent sandwich bag box. Also found there was a small set of digital scales.

Mr. Rush, who could see the kitchen search from the couch on which he was seated in the living room, commented to Sgt. Winkler that some of the crack was real and some was fake. The officers allowed him to come to the cabinet where he separated three bags that he said were crack from the other five bags that he said were not. After he found the bags, Sgt. Winkler then noticed in plain view on the kitchen counter a small white rock that appeared to be crack cocaine. He later found that the eight bags, real and fake, had a gross weight of 93 grams.

Mr. Rush was cooperative throughout and said he wanted to talk. Without the benefit of <u>Miranda</u> warnings, he volunteered in response to questions from Lt. Napier that he got the crack on Monday from a large black male named "Chaz" who was from Columbus. He paid $1,400 for it. It consisted of 1.5 ounces of "good stuff" and 1.5 ounces was fake. He also stated that he had sold crack to two people from Ms. Will's apartment to which he said he had come on Monday. Lt. Napier memorialized the statements by writing down on a single sheet of paper the questions he had asked and the answers Mr. Rush had given. Mr. Rush then placed his initials after each answer. The statement

is marked as given at 10:45 a.m. on May 23, 2012, and is signed at the bottom by both Mr. Rush and Lt. Napier.

Mr. Rush gave oral permission to the officers to search his vehicle which was located in front of the apartment. They found nothing of interest there. He also gave them his cell phone. After the search of the vehicle, the officers left, leaving Mr. Rush in the apartment.

An hour or two later, Mr. Rush, who had been asked to come to Metro Drug Unit headquarters in Dunbar to further identify his source in Columbus, voluntarily did so on his own. He was not placed under arrest.

II.

A. Lawfulness of the Search

The Fourth Amendment provides that "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV; see United States v. Rumley, 588 F.3d 202, 205 (4th Cir. 2009). One irreducible minimum of Fourth Amendment

jurisprudence "'is that warrantless searches and seizures inside a home are presumptively unconstitutional'" except for a few scrupulously limited exceptions. United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). While the exceptions are textually based upon the "reasonableness" clause, they nevertheless are "narrow and well-delineated in order to retain their constitutional character." Flippo v. West Virginia, 528 U.S. 11, 13 (1999) (per curiam) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). One such exception allows law enforcement to search a home if a resident therein consents.

It is well-settled that "when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over . . . the premises." United States v. Matlock, 415 U.S. 164, 171 (1974); see also United States v. Shrader, 675 F.3d 300, 306 (4th Cir. 2012). In Trulock, the court of appeals explained as follows:

> Consent to search in the absence of a warrant may, in some circumstances, be given by a person other than the target of the search. Two criteria must be met in order for third party consent to be effective. First, the third party must have authority to consent to the

6

search. Second, the third party's consent must be voluntary.

>  Authority to consent originates not from a mere property interest, but instead from "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched."

Trulock v. Freeh, 275 F.3d 391, 402-03 (4th Cir. 2001) (citations omitted); see also Randolph, 547 U.S. at 106 (noting that the "Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.") (citing Illinois v. Rodriguez, 497 U.S. 177 (1990)).

In accordance with this settled law, Ms. Wills, the lessee of the apartment, provided lawful consent to search. That consent was effective at least until law enforcement claimed that it had a warrant that, in actuality, did not exist. Once that inaccurate claim of authority was made, the circumstances changed based upon the synergistic effect of two Supreme Court decisions.

7

The first decision is <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006).  In <u>Randolph</u>, the Supreme Court held that "a <u>physically present</u> inhabitant's <u>express refusal of consent</u> to a police search is dispositive as to him, regardless of the consent of a fellow occupant."  <u>Id.</u> at 122-23 (emphasis added).  In the court of appeals' recent <u>Shrader</u> decision, it is indicated that an objecting defendant must come within the letter of this carve-out in order to benefit from its effect.  <u>See</u> <u>Shrader</u>, 675 F.3d at 306 (noting that "[t]he Supreme Court made clear [in <u>Randolph</u>] that to defeat a cotenant's consent, the defendant must be <u>both</u> 'present and objecting.'") (emphasis added) (quoting <u>Randolph</u>, 547 U.S. at 114.).  The Supreme Court reiterated as much in recent days.  <u>See</u> <u>Fernandez v. California</u>, 134 S. Ct. 1126, --- (2014) ("Our opinion in <u>Randolph</u> took great pains to emphasize that its holding was limited to situations in which the objecting occupant is physically present.").

The second decision is <u>Bumper v. North Carolina</u>, 391 U.S. 543 (1968).  In <u>Bumper</u>, law enforcement searched a home in which an accused and his grandmother cohabited.  Upon their arrival at the home, the officers told the grandmother that they had a search warrant.  She said "go ahead" and opened the front door.  The Supreme Court concluded the search was unlawful.

8

The majority opinion noted that the police could not rely on the grandmother's consent inasmuch as it was given only after law enforcement claimed to have a warrant. It further noted "that acquiescence to an assertion of lawful authority does not constitute an understanding, intentional and voluntary waiver of rights under the Fourth Amendment . . . ." See Trulock, 275 F.3d at 402 (summarizing the holding in Bumper); Bumper, 391 U.S. at 549-50, 548-549 (noting that, "[t]he situation is instinct with coercion . . . [w]here there is coercion, there cannot be consent" and that the government's burden of proving consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority").

It is true that law enforcement had the consent to search of one co-occupant. It did not need the consent of Mr. Rush. In inaccurately claiming that the search was supported by a warrant, however, law enforcement materially impaired Mr. Rush's right, under Randolph, to object when law enforcement entered the home. Just as in Bumper, "[t]he situation is instinct with coercion . . . ." That coercion effectively sealed Mr. Rush's lips closed when he might otherwise have objected, as was his right under Randolph. Under these circumstances, the court concludes that the search became

9

unlawful upon the incorrect claim that a warrant had issued. In view of that analysis, the court must now ascertain the appropriate remedy, if any.

B.   Applicable Remedy

As recently noted by the Supreme Court, "The Fourth Amendment protects the right to be free from 'unreasonable searches and seizures,' but it is silent about how this right is to be enforced." Davis v. United States, 131 S. Ct. 2419, 2423 (2011). The Supreme Court has created the exclusionary rule to serve that purpose, which, if applied, "bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." Id.

When a Fourth Amendment violation is found, the exclusionary rule is frequently employed. See, e.g., United States v. Oscar-Torres, 507 F.3d 224, 227 (4th Cir. 2007) ("Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations.") (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)); See United States v. Jones, 678 F.3d 293, 305 (4th Cir. 2012) ("[A]s we have explained, 'the exclusionary rule is our sole

means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone,' regardless of where that person resides or visits.") (quoting United States v. Foster, 634 F.3d 243, 249 (4th Cir. 2011)); United States v. Doyle, 650 F.3d 460, 466-67 (4th Cir. 2011) ("Ordinarily, when a search violates the Fourth Amendment, the fruits thereof are inadmissible under the exclusionary rule, 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.'") (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)).

There are exceptions to the rule and, above all, suppression is "not a personal constitutional right," nor contemplated as "redress" for the constitutional wrong done. Davis, 131 S. Ct. at 2426 (quoting Stone v. Powell, 428 U.S. 465, 486 (1976)). It is focused on deterrence, namely, preventing future Fourth Amendment violations. The Supreme Court in Davis treated the deterrent purpose at length:

> Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. The analysis must also account for the "substantial social costs" generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must

> swallow this bitter pill when necessary, but only as a "last resort." For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.
>
> We abandoned the old, "reflexive" application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits. In a line of cases beginning with <u>United States v. Leon</u>, we also recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the "flagrancy of the police misconduct" at issue.
>
> The basic insight of the <u>Leon</u> line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, . . . or when their conduct involves only simple, "isolated" negligence, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way."

<u>Id.</u> 2426-28 ("Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'")(quoting <u>United States v. Janis</u>, 428 U.S. 433, 454 (1976)).

So exclusion is considered when police practices are deliberate enough to result in "meaningfu[l]" deterrence and "culpable enough to be "'worth the price paid by the justice system.'" <u>Id.</u> at 2428 (quoting <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009)). For example, the Supreme Court in <u>Davis</u> declined the harsh remedy of exclusion inasmuch as "[t]he

officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence" nor did the "case involve any 'recurring or systemic negligence' on the part of law enforcement." Id. at 2429 ("We have stated before, and we reaffirm today, that the harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'").

Our court of appeals has recently had occasion to apply the principles espoused in Herring and Davis in United States v. Davis, 690 F.3d 226 (4th Cir. 2012), where it summarized the inquiry as follows:

> In determining the deterrent effect of applying the rule, the Herring Court explained that the deterrent effect is higher where law enforcement conduct is more culpable. Thus, "'an assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule."
>
> The Herring Court explained that the rule should not be applied where excluding the evidence would have little deterrent effect on future constitutional violations by law enforcement officers, and the cost to society of such a rule is high. Id. at 147–148, 129 S.Ct. 695 (concluding that "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way'" and the exclusionary rule should not be applied).

Id. at 251-52 (citations omitted) ("For exclusion to be appropriate, the deterrence benefits of suppression must

outweigh its heavy costs.")(internal quotation marks and citation omitted).  As noted by the court of appeals in Davis, those instances when the exclusionary rule is applied are situations where law enforcement actions are "'patently unconstitutional' . . . [on the order of] brazen or reckless." Id. at 256 (citation omitted); see also United States v. Gaines, 668 F.3d 170, 178 (4th Cir. 2012) (Niemeyer, J., dissenting) ("The principal cost of applying the [exclusionary] rule is, of course, letting guilty and possible dangerous defendants go free -- something that 'offends basic concepts of the criminal justice system,'" and the application of the rule is only proper 'where its deterrence benefits outweigh its substantial social costs . . . .'") (citations omitted).

     Where there is little to suggest a pattern of constitutional wrongdoing and little likelihood of future recurrences, the deterrent capacity of the exclusionary rule is diminished.  Compare, e.g., United States v. Davis, 690 F.3d at 256 ("We have no proof before us showing that victims' DNA profiles or individuals cleared of suspicion in an investigation are routinely entered into the local database by PGCPD, or have been entered into the database in any other instance. There is nothing in the record to suggest that the acts here are likely

14

to reoccur."), with United States v. Edwards, 666 F.3d 877, 886 (4th Cir. 2011) ("As the Supreme Court explained in Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), 'the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.  The facts and circumstances before us demonstrate conduct plainly within the purposes of the exclusionary rule.  [T]he circumstances under which Edwards was searched are likely to recur. Indeed, the evidence in this case showed that Baltimore City police officers conduct searches inside the underwear of about 50 percent of arrestees, in the same general manner as the strip search performed on Edwards.'").

B.  Analysis

When law enforcement arrived at the home, they had not only the primary occupant's consent to search.  They also had the key.  It is difficult to imagine a more concrete set of circumstances that would authorize a Fourth Amendment search. While Mr. Rush was inaccurately informed about the legal basis justifying the search, one can only speculate concerning whether he would have exercised his rights under Randolph had he known

otherwise.  While the intersection of <u>Butler</u> and <u>Randolph</u> comes into sharp focus upon reflection and study, it would have been less than apparent to the officers confronting the circumstances as they unfolded.

Additionally, law enforcement did not inaccurately inform Mr. Rush about the warrant in order to impair his ability to object.  It did so in a justifiable effort to protect Ms. Wills.  There is no basis in the record to suggest a pattern of constitutional wrongdoing.  There is likewise a vanishingly low likelihood of future recurrences.  The officers did not, as appears required by Supreme Court precedent, violate Mr. Rush's Fourth Amendment rights deliberately, recklessly, or with gross negligence, nor is there any recurring or systemic negligence on its part.  The deterrent capacity of the exclusionary rule in this instance is thus substantially diminished if not altogether absent.

Combined with the limited deterrent effect is the vast cost to the judicial system and society in the event that suppression is granted.  Mr. Rush was cooperative throughout his initial encounter with law enforcement and said he wanted to talk.  Upon observing that Sgt. Winkler had found the eight bags, Mr. Rush volunteered, without prompting, that three bags

contained crack and five bags held a counterfeit substance. Without the benefit of <u>Miranda</u> warnings, he volunteered significant inculpatory information in response to questions from Lt. Napier.  He went so far as to sign a written confession.

His cooperation did not there end.  Mr. Rush gave oral permission to the officers to search his vehicle and provided them his cell phone.  Then, an hour or two later, Mr. Rush appeared at Metro Drug Unit headquarters in Dunbar to further identify his source in Columbus.

In view of the limited deterrent effect and the grave consequences that suppression would visit upon the judicial and societal interests in further pursuing the prosecution, suppression is plainly unauthorized under Supreme Court precedent.

The court, accordingly, ORDERS that Mr. Rush's motion to suppress be, and hereby is, granted to the extent that it seeks a finding of the unlawfulness of the search and denied as to its residue, particularly insofar as it seeks exclusion of evidence in the case.

**The Clerk is directed to transmit a copy of this written opinion and order to the defendant and counsel of record.**

ENTER: March 13, 2014

_____
John T. Copenhaver, Jr.
United States District Judge